CROSNER LEGAL, P.C.
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Zachary M. Crosner (SBN 272295)
zach@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| BRIDGETT DICKERSON, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOIRON, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiff Bridgett Dickerson ("Plaintiff") on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this action against Boiron, Inc. ("Defendant" or "Boiron"), and upon information and belief and investigation of counsel, alleges as follows:

2.      This is a California consumer class action for violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), and for breach of express warranty.

3.      Defendant manufactures, distributes, advertises, markets, and sells the Optique1 Eye Drops (the "Product"). The Product is labeled as a "Homeopathic Medicine" that is intended for "Eye Irritation Relief," "Dry Eyes," "Allergies," and "Eye Strain," among other claims.

4.      Unfortunately, the Product is being illegally sold and is ineffective at providing "Eye Irritation Relief." On September 11, 2023, the United States Food and Drug Administration ("FDA") sent a warning letter to Boiron notifying it that the Product is "an unapproved new drug" and that "introducing or delivering this product for introduction into interstate commerce" violates the Food Drug and Cosmetics Act.[1]

5.      Not only is the Product illegal to sell, it is also falsely advertised as being effective at providing eye symptom relief. The purported "active" ingredients in the Product are so diluted that they are virtually non-existent and are scientifically proven to be incapable of providing the advertised eye symptom relief.

---

[1] *See* Warning Letter from the FDA to Boiron, Inc. dated September 11, 2023, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/boiron-inc-663402-09112023 and attached hereto as **Exhibit A**.

CROSNER LEGAL, P.C.

6.     Plaintiff, who purchased the Product in California, was deceived by Defendant's unlawful conduct and brings this action on her own behalf and on behalf of California consumers to remedy Defendant's unlawful acts.

**JURISDICTION AND VENUE**

7.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Product in California, specifically in this District. The marketing of the Product, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Product to consumers in California, including Plaintiff. The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold the deceptively advertised Product to Plaintiff and members of the Class in California. By distributing and selling the Product in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District because Plaintiff purchased the Product within this District.

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL, P.C.

## PARTIES

10.     Defendant Boiron, Inc. is a Pennsylvania corporation that maintains its principal place of business at 4 Campus Blvd., Newtown Square, Pennsylvania 19073. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Product.

11.     Plaintiff Bridgett Dickerson is a resident of San Bernardino County, California. Plaintiff purchased the Product during the class period in California. Plaintiff relied on Defendant's deceptive advertising and labeling claims as set forth below.

## FACTUAL ALLEGATIONS

### THE OPTIQUE1 EYE DROPS PRODUCT

12.     The front label of the Product prominently states that the Product is a "Homeopathic Medicine" intended for "Eye Irritation Relief," "Dry Eyes," "Allergies," and "Eye Strain."

13.     The front label also says that the Product will "Help Your Body the Natural Way" inside of a graphic of a green leaf leading reasonable consumers to believe that the Product is natural. The front label also says that the Product is "Soothing and Refreshing" and "Preservative-Free."

14.      The front label of the product is shown below.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL. P.C.

<u>Front Label of the Optique1 Eye Drops</u>



CLASS ACTION COMPLAINT

15. The back label of the Product shows that the "active" ingredients in the Product are homeopathic ingredients that are "officially monographed in the Homeopathic Pharmacopoeia of the United States" as shown below:

Back Label of the Optique1 Eye Drops

**Drug Facts**

**Active ingredients**** **Purpose***

Calcarea fluorica 10X HPUS 0.25%.........................Relieves eyestrain and fatigue characterized by flickering light

Calendula officinalis 4X HPUS 0.25%..........Relieves eye dryness associated with smoke or other airborne irritants

Cineraria maritima 6C HPUS 1.50%.....................................................Soothes sensitivity to light and glare
(contains less than 10⁻¹³ mg pyrrolizidine alkaloids)

Euphrasia officinalis 4X HPUS 1.00%........................................................Relieves burning, irritated eyes

Kali muriaticum 10X HPUS 0.25%..................................Alleviates gritty sensation (feeling of sand in the eye)

Magnesia carbonica 10X HPUS 0.25%..............Relieves sharp and brief eye irritation associated with eye fatigue

Silicea 10X HPUS 0.25%...............................................................................................Relieves tired eyes

*The letters "HPUS" indicate that the components in this product are officially monographed in the Homeopathic Pharmacopoeia of the United States.*

**Uses*** temporarily relieves minor eye irritation such as dry, red, itchy, and burning eyes due to:
■ eyestrain and fatigue    ■ light and glare    ■ digital displays
■ airborne irritants (pollens and dust)

**Warnings**

Obtain immediate medical treatment for all open wounds in or near the eyes.

To avoid contamination    ■ do not touch tip of dropper to any surface
■ do not touch the eye with the tip of the dropper    ■ do not reuse
■ once opened, discard dropper after each use.

**Do not use** if solution changes color or becomes cloudy.

**Stop use and ask a doctor if** you experience eye pain, changes in vision, continued redness or irritation of the eye, or if the condition worsens or persists for more than 72 hours.

**If pregnant or breastfeeding,** ask a health professional before use.

**Keep out of reach of children.** If swallowed, get medical help or contact a Poison Control Center right away.

**Directions**
■ Adults and children 2 years of age and older: At the onset of symptoms, put 1 to 2 drops, or more if necessary, in affected eye(s). Repeat 2 to 6 times a day, as needed, or as directed by a doctor.
■ Children under 2 years of age: Ask a doctor.    ▶

*CLAIMS BASED ON TRADITIONAL HOMEOPATHIC PRACTICE, NOT ACCEPTED MEDICAL EVIDENCE. NOT FDA EVALUATED.
**C, K, CK, and X are homeopathic dilutions: see BoironUSA.com/info for details.

CROSNER LEGAL, P.C.

1    16.    The side labels of the Product are shown below:

2              <u>Side Labels of the Optique1 Eye Drops</u>




CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

## THE PRODUCT IS MISBRANDED AND ILLEGAL TO SELL

17.     The federal Food, Drug, and Cosmetics Act ("FDCA") regulates the advertising, labeling, and sale of over-the-counter drug products. 21 U.S.C. § 301 *et seq.*; 21 C.F.R. Parts 200 and 300. California imposes requirements that are identical to the FDCA through its adoption of the Sherman Food, Drug, and Cosmetics Law, Cal. Health & Safety Code § 109875 *et seq.* ("Sherman Law"). The Sherman Law is explicitly authorized by the FDCA. *See* 21 U.S.C. § 343-1.

18.     On September 11, 2023, the FDA sent a warning letter to Boiron notifying it that the Product is "an unapproved new drug" and that "introducing or delivering this product for introduction into interstate commerce" violates the FDCA.[2] The FDA recognized that the term "drug" includes "articles recognized in the official Homeopathic Pharmacopeia of the United States (HPUS), or any supplement to it."[3] The ingredients in the Product are recognized in the HPUS. The FDA emphasized that "[h]omeopathic drug products are subject to the same statutory requirements as other drugs; nothing in the FD&C Act exempts homeopathic drugs from any of the requirements related to adulteration, misbranding, or FDA approval."[4]

19.     The Product is a "drug" as defined in 21 U.S.C. § 321(g)(1) because "it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, and/or intended to affect the structure or any function of the body."[5] The intended use of the Product is for treatment of eye conditions and the Product

---

[2] *See* Warning Letter from the FDA to Boiron, Inc. dated September 11, 2023, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/boiron-inc-663402-09112023 and attached hereto as **Exhibit A**.

[3] *Id*; 21 U.S.C. § 321(g)(1).

[4] *Id.*

[5] *Id.*

is intended to affect the structure and function of the body as shown by labeling statements such as "Eye Irritation Relief," "Dry Eyes," "Allergies," and "Eye Strain."

20.    The Product also does not comply with the law regarding "structure/function" claims made in conjunction with dietary supplements. The FDCA distinguishes between "disease claims" and "structure/function claims" that manufacturers make about their products, applying different regulatory standards to each. A structure/function claim, among other things, "describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans" or "characterizes the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function," but "may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases." 21 U.S.C. § 343(r)(6)(A), (C). A disease claim, conversely, "claims to diagnose, mitigate, treat, cure, or prevent disease," either explicitly or implicitly (such as by claiming that a product treats a disease's "characteristic signs or symptoms"). 21 C.F.R. § 101.93(g)(2)(ii); see also 21 U.S.C. § 343(r)(6).

21.    Structure/function claims must meet three requirements: (1) the manufacturer has substantiation that the statement is truthful and not misleading; (2) the statement contains a prominent disclaimer that the FDA has not evaluated the statement and that the product "is not intended to diagnose, treat, cure, or prevent any disease"; and (3) the statement itself does not "claim to diagnose, mitigate, treat, cure, or prevent" disease. 21 U.S.C. § 343(r)(6)(C). A dietary supplement manufacturer making only structure/function claims regarding its supplement must notify the Office of Nutritional Products, Labeling, and Dietary Supplements in the FDA. 21 C.F.R. § 101.93(a).

22.    The Product is not generally recognized as safe and effective (GRASE) for the above referenced uses and, therefore, the product is a "new drug" under the FDCA, 21 U.S.C. § 321(p). A "new drug," like the Product, may not be

introduced or delivered for introduction into interstate commerce without an approved application from FDA. 21 U.S.C. §§ 355(a) and 331(d). Defendant did not receive approval from the FDA before selling the Product.[6]

23.     Accordingly, Defendant has violated the FDCA and California's Sherman Law. Because the Product was illegal to sell throughout the class period, Plaintiff and the class members are entitled to a full refund of their purchase price.

**THE PRODUCT DOES NOT PROVIDE THE ADVERTISED EYE SYMPTOM RELIEF**

24.     The Product is sold as a "homeopathic medicine." However, homeopathy is a pseudoscience based on impossible "principles" that were developed in the late 1700s. The two main principles of homeopathy are "that a substance that causes symptoms in a healthy person can be used in diluted form to treat symptoms and illnesses, a principle known as 'like-cures-like'" and that "the more diluted the substance, the more potent it is, which is known as the 'law of infinitesimals.'"[7]

25.     The term "homeopathy" is derived from the Greek works homeo (similar) and pathos (suffering or disease). The National Center for Complementary and Integrative Health at the National Institutes of Health ("NIH") provides the following description about homeopathy:

> Supporters of homeopathy point to two unconventional theories: "like cures like"—the notion that a disease can be cured by a substance that produces similar symptoms in healthy people; and "law of minimum dose"—the notion that the *lower* the dose of the medication, the *greater* its effectiveness. Many homeopathic remedies are so diluted that no molecules of the original substance remain.[8]

---

[6] *See* Warning Letter from the FDA to Boiron, Inc. dated September 11, 2023, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/boiron-inc-663402-09112023 and attached hereto as **Exhibit A**.

[7] *Homeopathic Products*, FOOD AND DRUG ADMINISTRATION (Sept. 5, 2023), *available at* https://www.fda.gov/drugs/information-drug-class/homeopathic-products

[8] *See* https://nccih.nih.gov/health/homeopathy

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

With respect to the status of homeopathic research, the NIH states:

> Most rigorous clinical trials and systematic analyses of the research on homeopathy have concluded that there is little evidence to support homeopathy as an effective treatment for any specific condition.
>
> A 2015 comprehensive assessment of evidence by the Australian government's National Health and Medical Research Council concluded that there are no health conditions for which there is reliable evidence that homeopathy is effective.
>
> Homeopathy is a controversial topic in complementary medicine research. A number of the key concepts of homeopathy are not consistent with fundamental concepts of chemistry and physics. For example, it is not possible to explain in scientific terms how a remedy containing little or no active ingredient can have any effect. This, in turn, creates major challenges to rigorous clinical investigation of homeopathic remedies. For example, one cannot confirm that an extremely dilute remedy contains what is listed on the label, or develop objective measures that show effects of extremely dilute remedies in the human body.[9]

26.    The homeopathic ingredients in the Product are so diluted that they are virtually non-existent. For example, a 1C homeopathic dilution "is obtained by mixing 1 part of the Mother Tincture with 9 parts of ethanol in a new vial and then vigorously shaking the solution (succession)."[10]  This is intended to replicate the striking of the "medicine" against a bible, which is what was originally used by early proponents of homeopathy. Amongst consumers, there is poor understanding of the principles underlying homeopathic products.

27.    The FTC has commissioned consumer surveys that demonstrate consumers do not understand homeopathy and become skeptical when they are informed about the principles underlying homeopathy's efficacy theory.

---

[9] *See* https://nccih.nih.gov/health/homeopathy

[10] https://boironusa.com/info/

CROSNER LEGAL, P.C.

10
CLASS ACTION COMPLAINT

28.    According to results from FTC focus group tests, consumers "did not understand what 'homeopathic' means or how homeopathy works":[11]

> In fact, the parents and adults tended to group all non-conventional products together, including homeopathic products, into a single category, using the terms "natural," "herbal," and "homeopathic" interchangeably. More importantly, upon learning more about the theory of homeopathy after Shugoll representatives explained the principles behind it to them, many participants became skeptical about its efficacy and more guarded against using it. These results suggest that many consumers may choose homeopathic products based on incorrect and incomplete information about them. When given additional information, however, they looked more critically at homeopathic treatments and had a better basis on which to evaluate them in comparison to other remedies.[12]

29.    The FTC also commissioned surveys exposing consumers to different homeopathic product packages. These copy test results "showed that consumers mistakenly believed that the manufacturers of homeopathic products tested their products on people in order to show their effectiveness." The results also "support the conclusion that consumers have incorrect perceptions about human efficacy testing for homeopathic products."[13]

30.    Published research shows that the principles of homeopathy are physically impossible.[14] "Through the laws of physics, homeopathic medicines

---

[11] *See* Federal Trade Commission, Comments of the Staff of the Federal Trade Commission, In Response to a Request for Comments Related to its Public Hearing on Homeopathic Product Regulation: Evaluating the Food and Drug Administration's Regulatory Framework After a Quarter-Century (Aug. 21, 2015) *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-food-drug-administration-regarding-current-use-human-drug-biological-products/150821fdahomeopathic.pdf

[12] *Id.* at 11-12.

[13] *Id.* at 14-15.

[14] D. Grimes, *Proposed mechanisms for homeopathy are physically impossible,* FOCUS ON ALTERNATIVE AND COMPLEMENTARY THERAPIES (Sept. 2012), abstract available at https://onlinelibrary.wiley.com/doi/abs/10.1111/j.2042-7166.2012.01162.x

CLASS ACTION COMPLAINT

appear to have zero chance of containing any biologically active component. Evidence from physical chemistry also rules out the plausibility of mechanisms such as water memory."[15] Any "benefit" that homeopathy purportedly provides "is compatible with the notion that the clinical effects of homoeopathy are placebo effects."[16]

31.  The United States National Center for Complementary Integrative Health has stated that "[t]here's little evidence to support homeopathy as an effective treatment for any specific health condition."[17] A 2015 comprehensive assessment of evidence by the Australian government's National Health and Medical Research Council similarly concluded that "there are no health conditions for which there is reliable evidence that homeopathy is effective."[18]

32.  The United Kingdom's House of Commons Science and Technology Committee found there is no scientific evidence to support a claim that homeopathy works and that the systematic reviews and other meta analyses conclusively demonstrated that homeopathic products performed no better than

---

[15] *Id.*

[16] A. Shang, et al., *Are the clinical effects of homoeopathy placebo effects? Comparative study of placebo-controlled trials of homoeopathy and allopathy,* THE LANCET (Aug. 27, 2005), abstract available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(05)67177-2/fulltext

[17] *Homeopathy: What You Need To Know,* NATIONAL CENTER FOR COMPLEMENTARY INTEGRATIVE HEALTH, *available at* https://www.nccih.nih.gov/health/homeopathy

[18] *NHMRC Statement: Statement on Homeopathy,* AUSTRALIAN GOVERNMENT-NATIONAL HEALTH AND MEDICAL RESEARCH COUNCIL, *available at* https://www.nhmrc.gov.au/file/14825/download?token=40ze36WK

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

placebos, information that is not disclosed to consumers.[19] As Professor David Colquhoun, Professor of Pharmacology at the University College of London, put it: "If homeopathy worked the whole of chemistry and physics would have to be overturned."[20]

33.     The Federal Trade Commission released an enforcement policy statement concerning homeopathic products and stated that "the case for efficacy is based solely on traditional homeopathic theories and there a no valid studies using current scientific methods showing the product's efficacy."[21] "Accordingly, marketing claims that such homeopathic products have a therapeutic effect lack a reasonable basis and are likely misleading in violation" of the FTC Act.[22]

34.     Because the homeopathic ingredients in the Product cannot provide any type of symptom relief, Defendant's labeling statements that the Product provides "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain" are false and misleading.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S FALSE LABELING STATEMENTS AND SUFFERED ECONOMIC INJURY**

35.     Consumers, like Plaintiff, relied on Defendant's labeling statements that the Product provides "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain." Plaintiff and the putative class members suffered

---

[19] *Evidence Check 2: Homeopathy - Science and Technology Committee*, UNITED KINGDOM HOUSE OF COMMONS, *available at* https://publications.parliament.uk/pa/cm200910/cmselect/cmsctech/45/4504.htm

[20] *Id.*

[21] *Enforcement Policy Statement on Marketing Claims for OTC Homeopathic Drugs*, FEDERAL TRADE COMMISSION, *available at* https://www.ftc.gov/system/files/documents/public_statements/996984/p114505_otc_homeopathic_drug_enforcement_policy_statement.pdf

[22] *Id.*

CROSNER LEGAL. P.C.

economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Product that was falsely labeled and illegal to sell. Consumers, including Plaintiff, would not have purchased Defendant's Product, or would have paid less for the Product, if they had known the Product was being sold illegally and that the ingredients in the Product are incapable of providing the advertised eye symptom relief.

### PLAINTIFF'S PURCHASE OF THE PRODUCT

36.     Plaintiff Bridgett Dickerson purchased the Optique1 Eye Drops beginning in approximately December of 2022 and continuing until approximately January of 2023. Plaintiff purchased the Product from Walmart and Walgreens stores located in or around Rialto, California.

37.     Plaintiff saw and relied on the "Eye Irritation Relief," "Dry Eyes," "Allergies," and "Eye Strain" statements on the label of the Product. Plaintiff would not have purchased the Product, or would have paid less for the Product, had she known that the product was illegal to sell and that the ingredients in the Product are incapable of providing the advertised symptom relief. As a result, Plaintiff suffered injury in fact when she spent money to purchase the Product she would not have purchased, or would have paid less for, absent Defendant's misconduct. Plaintiff desires to purchase the Product again if the labels of the Product were accurate and if the Product actually provided the advertised eye symptom relief and if the product was sold legally. However, as a result of Defendant's ongoing misrepresentations and misconduct, Plaintiff is unable to rely on the Product's advertising and labeling when deciding in the future whether to purchase the Product.

38.     Like all reasonable consumers, Plaintiff did not notice any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or

packaging that contradicted the prominent front-label deceptive "Eye Irritation Relief," "Dry Eyes," "Allergies," and "Eye Strain" statements at the point of sale. Published marketing and advertising research has found that back label and fine-print disclaimers do not influence consumer purchase behavior.[23]

### NO ADEQUATE REMEDY AT LAW

39.    Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Product more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

40.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Product, across a multitude of media platforms, including the product labels, packaging, and online advertisements, over a long period of time, in order to gain an unfair advantage over competitor products. The UCL also creates a cause of action for violations of law. This is especially important here because Plaintiff alleges Defendant has committed "unlawful" acts and brings a claim for violation of the UCL's "unlawful prong." Specifically, Defendant has violated the FDCA and California's Sherman Law, among other laws. No other causes of actions allow this claim to proceed, and thus, there is no adequate remedy at law for this specific

---

[23] *See e.*g, Karen Russo France and Paula Fitzgerald Bone (2005), *Policy Makers' Paradigms and Evidence from Consumer Interpretations of Dietary Supplement Labels*, JOURNAL OF CONSUMER AFFAIRS, 39(1):27-51; Marlys J. Mason, Debra L. Scammon, and Xiang Fang (2007), *The Impact of Warnings, Disclaimers, and Product Experience on Consumers' Perceptions of Dietary Supplements*, JOURNAL OF CONSUMER AFFAIRS, 41(1):74-99; Aaron S. Kesselheim, John Connolly, James Rogers, and Jerry Avorn (2015), *Mandatory Disclaimers On Dietary Supplements Do Not Reliably Communicate The Intended Issue*, HEALTH AFFAIRS, 34(3):438-446 at 445.

CROSNER LEGAL, P.C.

violation of the UCL's unlawful prong. Plaintiff's UCL unlawful prong claim does not rest on the same conduct as her other causes of action, and there is no adequate remedy at law for this specific claim. Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

41.    A primary litigation objective in this litigation is to obtain injunctive relief. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Product. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures or halting the sale of unlawful sold products is necessary to dispel the public misperception about the Product that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements stating that the Product was sold illegally and that the ingredients in the Product are incapable of providing the advertised symptom relief. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation has not yet completed, rendering injunctive relief necessary. Further, because a public injunction is available under the UCL, and

CLASS ACTION COMPLAINT

damages will not adequately benefit the general public in a manner equivalent to an injunction.

42. It is premature to determine whether an adequate remedy at law exists. This is an initial pleading and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves her right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

**CLASS ACTION ALLEGATIONS**

43. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons who purchased the Product for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

44. Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Product from Defendant.

45. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate

CLASS ACTION COMPLAINT

subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

46. The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

47. <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

48. <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a. Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Product;

b. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product;

c. Whether Defendant made misrepresentations concerning the Product that were likely to deceive the public;

d. Whether Plaintiff and the Class are entitled to injunctive relief;

e. Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

49. <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Product. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

50.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

51.   The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.   The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

CROSNER LEGAL, P.C.

e.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class Members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

52.     Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

53.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

54.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Consumers Legal Remedies Act**

**Cal. Civ. Code § 1750 *et seq.***

55.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

CLASS ACTION COMPLAINT

56.     Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

57.     At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

58.     At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

59.     At all relevant times, the Product manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

60.     The purchases of the Product by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

61.     Defendant disseminated, or caused to be disseminated, through its advertising, false and misleading representations, including the Product's labeling that the Product provides "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain." Defendant failed to disclose that the ingredients in the Product are incapable of providing the advertised eye symptom relief and that the Product was being sold illegally. This is a material misrepresentation and omission as reasonable consumer would find the fact that the Product is ineffective and illegal to be important to their decision in purchasing the Product. Defendant's representations violate the CLRA in the following ways:

a)     Defendant represented that the Product has characteristics, ingredients, uses, and benefits which it does not have (Cal. Civ. Code § 1770(a)(5));

b)     Defendant represented that the Product is of a particular standard, quality, or grade, which it is not (Cal. Civ. Code § 1770(a)(7));

c)     Defendant advertised the Product with an intent not to sell the Product as advertised (Cal. Civ. Code § 1770(a)(9)); and

21

CROSNER LEGAL, P.C.

d)      Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

62.    Defendant violated the CLRA because the Product was prominently advertised as being able to provide "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain" but, in reality, the ingredients in the Product are incapable of providing the advertised eye symptom relief and the product was being sold illegally. Defendant knew or should have known that consumers would want to know that the Product was ineffective and illegal to sell.

63.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's and the Class members' rights and were wanton and malicious.

64.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the  Product has characteristics which it does not have.

65.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

66.    Pursuant to California Civil Code section 1782, Plaintiff will notify Defendant in writing by certified mail of the alleged violations of the CLRA and will demand that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA, then Plaintiff will amend her complaint to seek damages.

67.    Pursuant to section 1780(d) of the CLRA, attached hereto is an affidavit showing that this action was commenced in a proper forum.

CROSNER LEGAL, P.C.

**SECOND CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

68.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

69.    Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

70.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

71.    Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. § 17500, *et seq.*, the Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, California's Sherman Law, Cal. Health & Safety Code § 109875 *et seq.* and by breaching express warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

72.    Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further,

23

Defendant failed to disclose a material fact (that the Product is ineffective and illegal to sell) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

73.    Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Product set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Product is effective and legal to sell.

74.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Product. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Product and Defendant's unlawful, unfair, and fraudulent practices.

75.    Defendant's wrongful business practices and violations of the UCL are ongoing.

76.    Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

77.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff,

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

individually and on behalf of the Class, seeks (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

**THIRD CLAIM FOR RELIEF**

**Breach of Express Warranty**

78.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

79.    Plaintiff brings this claim for breach of express warranty individually and on behalf of the Class against Defendant.

80.    As the manufacturer, marketer, distributor, and seller of the Product, Defendant issued an express warranty by representing to consumers at the point of purchase that the Product provides "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain."

81.    Plaintiff and the Class reasonably relied on Defendant's misrepresentations, descriptions and specifications regarding the Product, including the representation that the Product provides "Eye Irritation Relief" and relief for "Dry Eyes," "Allergies," and "Eye Strain."

82.    Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class.

83.    In fact, the Product does not conform to Defendant's representations because the Product is incapable of providing the advertised eye symptom relief and was illegal to sell. By falsely representing the Product in this way, Defendant breached express warranties.

84.   Plaintiff relied on Defendant's (the manufacturer) representations on the Product's labels and advertising materials which provide the basis for an express warranty under California law.

85.   As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class were injured because they: (1) paid money for the  Product that was not what Defendant represented; (2) were deprived of the benefit of the bargain because the   Product they purchased  was  different  than Defendant advertised; and (3) were deprived of the benefit of the bargain because the  Product they purchased had less value than if Defendant's representations about the characteristics of the   Product were truthful. Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class Members would not have purchased the Product or would not have paid as much as they did for it.

<u>**REQUEST FOR RELIEF**</u>

Plaintiff, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim set forth in this complaint, as follows:

a.   Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.   Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.   Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.   Ordering damages in amount which is different than that calculated for restitution for Plaintiff and the Class;

e.   Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

CLASS ACTION COMPLAINT

f.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.      Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: November 20, 2023                    CROSNER LEGAL, P.C.

                                            By:      */s/ Michael T. Houchin*
                                                     MICHAEL T. HOUCHIN

                                            9440 Santa Monica Blvd. Suite 301
                                            Beverly Hills, CA 90210
                                            Tel: (866) 276-7637
                                            Fax: (310) 510-6429
                                            mhouchin@crosnerlegal.com

                                            *Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.

### Affidavit Pursuant to Civil Code Section 1780(d)

I, MICHAEL T. HOUCHIN, declare as follows:

1.     I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff.

2.     This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3.     Defendant Boiron, Inc. has done, and is doing, business in California, including in this county. Such business includes the marketing, promotion, distribution, and sale of the Product within the State of California.

4.     Plaintiff alleges that she purchased the Product in San Bernardino County, California within this judicial district.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed November 20, 2023 at San Diego, California.

CROSNER LEGAL, P.C.

By:     /s/ Michael T. Houchin
          MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com

CLASS ACTION COMPLAINT